UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| VICKI REDDEN, | ) | Civil Action No.: 4:05-3504-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| MENTAL HEALTH and PEE DEE | ) | |
| MENTAL HEALTH CENTER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff alleges a cause of action for retaliatory discharge pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  Presently before the Court is Defendants' Motion for Summary Judgment (Document # 19).[1]  A hearing was held on August 2, 2007, during which the undersigned directed the parties to submit supplemental briefs by August 10, 2007.  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

---

[1]Following their Motion for Summary Judgment, Defendants filed a Motion to Stay (Document # 20) pending the Court's resolution of the Motion for Summary Judgment.  However, subsequent to the filing of the Motion to Stay, the parties jointly moved for an extension of the scheduling order deadlines, which was granted, and a new scheduling order was entered.  The scheduling order has since been amended twice.  Thus, the Motion to Stay is moot.

## II.    FACTUAL HISTORY

Plaintiff began working for Defendants[2] in 1989 as a Therapeutic Assistant in Lake City, South Carolina. Plaintiff Dep. at 9-12. In 1992, Plaintiff was transferred to Florence, South Carolina and began working as a Program Manager I. Id. at 11-12. In that position, Plaintiff was required to travel to various PDMHC offices, including the Lake City office, and meet with other program coordinators to discuss the availability of jobs for mental health clients in their area. Id. at 14; Sullen Dep. at 14-15.

Shortly after Plaintiff was transferred from Lake City to Florence, Dennis Sullen (Sullen) was appointed director of the Lake City office. Plaintiff Dep. at 13-14; Sullen Dep. at 14-15. Plaintiff became acquainted with Sullen through her visits to the Lake City Office. Id. Plaintiff and Sullen considered themselves friends. Plaintiff Dep. at 15-16; Sullen Dep. at 16-17. In August of 2003, Sullen was appointed Director of the Community Support Program in Florence, in which position he supervised all employees of the program, including Plaintiff. Plaintiff Dep. at 15, 89; Sullen Dep. at 11. Plaintiff testified that she was happy when Sullen received the promotion and never expressed any disdain about his ability as a supervisor. Plaintiff Dep. at 18, 20. However, Dionne Graham (Graham), one of Plaintiff's co-workers and friends, averred that, in early August of 2003, while at lunch with several other co-workers, Plaintiff voiced her opinion that "'[w]e needing to stick together and get rid of Mr. Sullen, he's nothing but trouble,'" and "'He's only going to do what those white folks tell him to do because he's an Uncle Tom.'" Graham Aff. at ¶ 4. Levern Thompson (Thompson), another co-worker present during the lunch conversation, averred that Plaintiff said

---

[2]Defendant Pee Dee Mental Health Center (PDMHC) is an outpatient facility of Defendant South Carolina Department of Mental Health (SCDMH). All employees of PDMHC are SCDMH employees.

about Sullen: "'He's got to go!'" Thompson Aff. at ¶ 4.

A few weeks later, while Plaintiff was in Graham's office, Graham told Plaintiff that Sullen made her feel uncomfortable by constantly coming in and out of her office and putting his hand on her shoulder.  Plaintiff Dep. at 27-28; Plaintiff Aff. at ¶ 4.  Graham also told Plaintiff that Sullen came into her office one day and blocked the door and she felt like she could not get out.  Id. Plaintiff did not ask Graham any questions at that time, but felt concerned that Graham seemed upset.  Id. at 36.

Plaintiff testified that Sullen had come into her office before and she had seen him go into Graham's and other employees' offices.  Id. at 29-30.  Plaintiff testified that she had not seen Sullen put his hand on Graham's or any other employee's shoulder, but she had seen him touch other employees on the hand when talking to them.  Id. at 34-35.

Later in the day[3] after Graham's conversation with Plaintiff, Plaintiff, Graham, Thompson, and two other co-workers, Scottie Swinton (Swinton) and Shainaria Gray (Gray), were in Graham's office having a conversation.  Graham Aff. at ¶ 7  Graham testified as follows regarding that conversation:

> We were having a general conversation and I asked the group if Dennis Sullen had ever made any of them uncomfortable?  I said that Mr. Sullen has a habit of putting his hands on my shoulder when talking with me. [Plaintiff's] immediate comment was that "He ain't doing anything but sexual harassing you."
> Mr. Thompson then said, "No, because he does me like that, too."  Mr. Thompson also said "That's just him . . . he's a very touchy person and means no harm." [Plaintiff] again said "He is sexual harassing you and I'm going to tell."  I then said to [Plaintiff], "Don't you do that, I don't believe that's sexual harassment, somebody touching you on the shoulder."  I said I didn't take it as if he was sexual harassing me.  I just asked because I wanted to know if he interacts with others like

---

[3]Plaintiff testified that this conversation occurred on approximately August 19, 2003. Plaintiff Dep. at 36.  Graham testified that it occurred on August 15, 2003.  Graham Aff. at ¶ 7.

that as well.

Graham Aff. at ¶¶ 7-8; see also Graham Dep. at 26-27. Thompson asked Graham if Sullen did or said anything inappropriate while she was with him, and Graham stated to the group that he had not. Thompson Aff. at ¶ 6. Graham testified that everyone in the room except for Plaintiff indicated that they agreed with her and Thompson that Sullen's actions did not amount to sexual harassment. Graham Dep. at 108.

Graham averred that during the group conversation, "I made it clear to [Plaintiff] that I didn't think Mr. Sullen was sexual harassing me and [Plaintiff] insisted that he was. [Plaintiff] said that I was scared of Mr. Sullen and that Dr. Keith, the Assistant Director, needed to know. I said to [Plaintiff] that I was not afraid of Mr. Sullen and that [Plaintiff] should not report this as sexual harassment and that she did not what [sic] she was talking about." Graham Aff. at ¶ 9.

According to Plaintiff, Graham did not describe the incident with Sullen any differently in the group conversation than she did when she spoke with Plaintiff alone. Plaintiff Dep. at 38. Plaintiff asserts that neither she, nor Swinton, nor Gray, nor Thompson said anything in response to Graham; they just "sat there and listened to her." Id. at 38-40.

Swinton submitted a sworn statement to Linda Shillinglaw in the Personnel Office regarding his recollection of the conversation. Ex. 22 to Plaintiff's Supplemental Response. According to Swinton, "Ms. Graham made the comment that 'I do not feel comfortable with him (Dennis Sullen) coming to my office at times.' No further details were discussed while I was present and this was the only time this was mentioned in my presence by Ms. Graham." Id.

Gray also submitted a sworn statement. Ex. 23 to Plaintiff's Supplemental Response. Gray states that "Dionne Graham made a statement that she felt very uncomfortable when department head,

Dennis Sullen, looked over her shoulder.  It was my understanding that was **NOT** a statement with

regards to sexual harassment, but rather to a general discomfort with **ANYONE** looking over her

shoulder as a rule of courtesy." Id.

Thompson avers that "Ms. Dionne Graham made a comment that there was one time that she

felt uncomfortable around Dennis Sullen because that one time he put his hands on her shoulder when

he was talking with her.  I then said to the group that Mr. Sullen does the same thing to me and others

when he is talking with them.  I asked Ms. Graham if Mr. Sullen said or did anything inappropriate

while she was talking with him.  Ms. Graham told the group no that Mr. Sullen had not." Thomspon

Aff. at ¶¶ 5-6.

On August, 20, 2003, Graham met with her direct supervisor, Lynn Melton (Melton) and

wanted to know the definition of sexual harassment under the law.  Melton Dep. at 14.  Graham

expressed concerns that Sullen had put his hand on her shoulder, had gone into her office several

times and one time she felt as if he was blocking the doorway. Id. at 15.  Graham indicated to Melton

that she felt uncomfortable. Id. at 16.  Melton went over the Department's policy regarding sexual

harassment and asked Graham to observe Sullen's interactions with other staff people and come back

to her and tell her what she wanted to do. Id. at 17.  At that time, Graham did not indicate one way

or the other whether she felt Sullen's actions amounted to sexual harassment. Id.  Following her

conversation with Graham, Melton reported Graham's concerns to Dr. Keith, Acting Director of

PDMHC. Id. at 50.  Dr. Keith indicated that someone had already spoken to him on the matter. Id.

at 51.

On approximately August 21, 2003, Plaintiff reported to Dr. Keith that Graham felt

uncomfortable with Sullen.  Plaintiff Dep. at 42.  Dr. Keith told Plaintiff that he would look into it.

Id. at 43.  Dr. Keith did not ask any follow up questions and Plaintiff did not offer any additional information.  Id.  Plaintiff did not tell Dr. Keith that Sullen's actions amounted to sexual harassment even though she felt like it was.  Id. at 43-44.

Plaintiff avers that on approximately August 22, 2003, Dr. Keith mentioned to her that Michelle Keys in the Records Department, had told him that Graham had told her the same things about Sullen as Graham had told her.  Plaintiff Aff. at ¶ 8.  Keys told a SCHAC  investigator that Graham told her she was uncomfortable around Sullen, but Graham did not say why she was uncomfortable nor did she mention sexual harassment.  Ex. 15 (EEOC P0084) to Plaintiff's Response. Plaintiff also avers that she later found out from Dr. Keith that he met with Sullen and told him that three different people had informed him of Graham's complaints about him.  Plaintiff Aff. at ¶ 7.

Swinton, who was present during the group conversation regarding Graham's concerns about Sullen, also reported to Dr. Keith that Graham was being sexually harassed by Sullen.  Ex. 15 (EEOC P0100) to Plaintiff's Response.

After Plaintiff met with Dr. Keith, Plaintiff called Graham at home and told her that she had complained to Dr. Keith that she (Graham) was being sexually harassed by Sullen.  Graham Dep. at 39.  Graham asked Plaintiff why she went to Dr. Keith and Plaintiff responded that she did so because Sullen was sexually harassing her and she needed to report it.  Id. at 39-40.

Following Graham's conversation with Plaintiff, Dr. Keith spoke with Graham and asked her if she was being sexually harassed by anyone.  Id. at 40-41.  She told him that she was not.  Id. at 41. Graham then reported back to Melton and told her that she did not think she was being sexually harassed.   Ex. 20 to Plaintiff's Response.

According to Graham, Plaintiff started acting "ugly" towards her following these events.

Graham Dep. at 80.  Plaintiff was slamming doors and snatched papers out of Graham's hands.  Id. She described Plaintiff's behavior as "very unprofessional." Id. at 82.  Graham reported Plaintiff's behavior to Plaintiff's supervisor, Sullen, and said that something needed to be done about it.  Id. at 81-82.  She did not suggest what needed to be done.  Id. at 82.

Graham also told Sullen of the conversation that she and Plaintiff had about him and that Plaintiff thought he was sexually harassing Graham and that Plaintiff had reported it to Dr. Keith. Sullen Dep. at 25; Graham Dep. at 67.  Graham testified that Sullen got upset when she told him and said that Plaintiff's report was slander and defamation of character.  Graham Dep. at 69-70.

Plaintiff testified that after Sullen learned of her report to Dr. Keith, Sullen began treating her differently by refusing to speak with her, even about work-related questions she had.  Plaintiff Dep. at 46-47.  Plaintiff also testified that some people told her that Sullen was talking about her to other people.  Id. at 52-53.

On September 5, 2003, Sullen contacted the SCDMH Human Resources Department in Columbia and spoke with the Employee Relations Manager, Funneaser "Nessie" Jacobs (Jacobs). Sullen Dep. at 34.  Sullen testified about his conversation with Jacobs as follows:

> I reported to her that although I had been informed by Dr. Keith that there was going to be an investigation for sexual harassment against me, I had been told by two employees, and I named the employees, Ms. Seitz and Ms. Tanner, that [Plaintiff] was saying through the office that I had sexually harassed this person, voiced my concern that with no founded information–with the allegation not being founded at this point in time, that was slanderous towards my name and I wanted it to cease.

Id.  Sullen testified that he had never himself seen or heard Plaintiff discussing her allegations against him.  Id. at 35.  Jacobs asked Sullen to put his concerns in writing, which he did.  Sullen Dep. at 36.  In his memo to Jacobs, Sullen stated,

I am requesting an investigation and want the allegations stopped immediately. [Plaintiff] is slandering my name and damaging relations I have with co-workers and potentially with people in the community.  This situation is complicated since I am [Plaintiff's] supervisor.  Therefore I am requesting permission to move supervision of [Plaintiff] to another employee in my department.

Ex. 20 to Plaintiff's Response.

On September 29, 2003, Jacobs visited PDMHC to investigate Sullen's claim.  Jacobs Aff.

at ¶ 6.  She interviewed Sullen, Graham, Plaintiff, Dr. Keith, Thompson and two other employees,

Christy Seitz and Cassandra McCray.  Id.  Jacobs averred as follows in her affidavit,

Based on the information I received during my investigation, and based upon my own evaluation of the witnesses, I concluded that [Plaintiff] knew or reasonably should have known that Ms. Graham was not being sexually harassed.  Moreover, I concluded that [Plaintiff] continued to act improperly after making her complaint by discussing that alleged "sexual harassment" with Ms. Graham and perhaps others, which led to the entire workplace being filled with unsupported rumors and speculation, potentially damaging to Mr. Sullen's reputation.  Further, the fact that [Plaintiff] was uncooperative in her interview played a significant role in me reaching the conclusion that she had not made the complaint in good faith, but rather with malicious intent.

Id. at ¶ 16.

At some point, Plaintiff began hearing rumors that Defendants were considering moving her

to another office.  Plaintiff Dep. at 51-52.  On October 3, 2003, Plaintiff wrote a letter to Dr. Main,

who had recently replaced Dr. Keith as Director of PDMHC, stating,

I feel I am being retaliated [sic] by my immediate supervisor and that I am being threatened in my employment role.  I not longer feel secure in my position at this Center and therefore I am requesting a change in my supervisor immediately.  Due to prior situations which you are unaware of I feel that it would be in my best interest to work for another supervisor at this Center. . . . I respect my position and do not want to work in another area of the Center at this time.

Ex. 18 to Plaintiff's Response.

On October 6, 2003, Jacobs submitted her findings to Dr. Main and recommended that

Plaintiff be disciplined pursuant to SCDMH policy for knowingly instigating and circulating a false and malicious rumor contrary to good order.  Jacobs Aff. at ¶¶ 17-18.  She also recommended that Plaintiff be transferred out from under Sullen's immediate supervision and away from Graham to avoid any further complications and disharmony in the Florence PDMHC workplace.  Id.  Following his receipt of Jacobs' recommendations, Dr. Main asked Sullen for his advice as to whether Plaintiff should be transferred or terminated.  Sullen Dep. at 65-66.  Sullen recommended that Plaintiff be transferred because he did not think termination was warranted.  Id. at 66.

Dr. Main met with Plaintiff on October 8, 2003.  Plaintiff Dep. at 60-61.  He informed Plaintiff that she was a troublemaker, that she was spreading rumors about Sullen and that she should think about transferring to the Restorative Independent Living Skills (RILS) program in Lake City or "you know what comes next."  Id. at 60-63.  In response, Plaintiff informed Dr. Main that she had not spread any rumors and believed that she was being retaliated against.  Id.  She also informed him that she felt nervous and uncomfortable, that she Sullen was spreading rumors about her and that Sullen refused to supervise her.  Id.

Dr. Main called Plaintiff into his office again a couple of days later and gave her the option of transferring to the RILS program in either Hartsville or Lake City.  Id. at 67-68.  Plaintiff told Dr. Main that she did not want to transfer to either of the programs because both locations would be a big inconvenience for her.  Id. at 68.   Dr. Main then told Plaintiff to report to the Lake City office the following Monday.  Id. at 69.

Following this discussion with Dr. Main, Plaintiff was out on sick leave for approximately six weeks pursuant to a doctor's order.  Id. at 71.  When Plaintiff reported to the Lake City office, her immediate supervisor was Margerite Davis.  Joseph Graham 30(b)(6) Dep. at 20. Davis reported

to Sullen. Id. at 20-21. Although Plaintiff did not lose any pay as a result of the transfer, she was no longer responsible for the supervision of any employees as she was in her position in Florence. Id. at 22.

On December 2, 2003, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission (SCHAC) and the United States Equal Employment Opportunity Commission (EEOC). Plaintiff Dep. at Ex. 3. In an affidavit attached to the Charge of Discrimination, Plaintiff stated, "I have been retaliated against for helping out a friend/co-worker by properly reporting that Mr. Sullen may be sexually harassing Ms. Graham." Id.

Following their investigations, both the SCHAC and the EEOC issued determinations that Plaintiff's claim of retaliation was supported by the evidence and that no evidence existed to support Defendants' contention that Plaintiff discussed the sexual harassment complaint with anyone except Dr. Keith and Ms. Graham. Ex. 12 to Plaintiff's Response; Ex. 19 to Plaintiff's Response. On November 4, 2004, the SCHAC issued a Notice of Right to Sue to Plaintiff. Plaintiff Dep. at Ex. 9. On September 15, 2005, the EEOC issued its Notice of Right to Sue to Plaintiff. Id. This action was filed on October 3, 2005.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as

provided in this rule, an adverse party may not rest upon the mere allegations or denials of the

adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in

this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celotex

Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion

to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere

pleadings themselves").  To raise a genuine issue of material fact, a party may not rest upon the mere

allegations or denials of his pleadings.  Rather, the party must present evidence supporting his or her

position through "depositions, answers to interrogatories, and admissions on file, together with ...

affidavits, if any."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  See also Cray

Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v.

-11-

Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## VI.    DISCUSSION

Plaintiff alleges that her transfer to a different position in the Lake City office was in retaliation for her report to Dr. Keith that Sullen had sexually harassed Graham.[4]  Title 42, Section 2000e-3(a) of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action.  Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985).

Defendants concede for purposes of summary judgment that Plaintiff meets the second and third elements of a prima facie case of retaliation.  However, Defendants argue that Plaintiff did not engage in protected activity, and thus, fails to meet the first element.

To establish "protected activity" Plaintiff must show she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring.  Bigge v. Albertsons, Inc.,

---

[4]In her Complaint, Plaintiff alleges that Defendants also retaliated against her for her letter to Dr. Main that Sullen was retaliating against her.  In their Motion for Summary Judgment, Defendants argue that such a claim is procedurally barred because Plaintiff failed to raise it in her Charge of Discrimination.  See Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 132 (4th Cir. 2002)("The EEOC charge defines the scope of the plaintiff's right to institute a civil suit.").  Plaintiff does not address this argument in her Response to Defendant's motion.  To the extent that Plaintiff is pursuing such a claim, Defendants are correct that the claim is procedurally barred for failure to raise it in her Charge of Discrimination.

894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII

oppositional retaliation claimant need not show that the underlying claim of sexual harassment was

in fact meritorious in order to prevail). "The inquiry is therefore (1) whether [plaintiff] 'subjectively

(that is, in good faith) believed' that the [defendant] had engaged in [an illegal practice], and (2)

whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer

to as one of 'reasonable belief.'" Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003)(citing Weeks v.

Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)).

Plaintiff contends that the unlawful employment practice she opposed was the alleged sexual

harassment of Graham by Sullen.  Defendants maintain that no sexual harassment actually occurred

and Plaintiff's belief that it had occurred was not objectively reasonable.  As noted above, Plaintiff

need not show that the underlying claim of discrimination was in fact meritorious in order to prevail.

Ross, 759 F.2d at 357 n. 1.  Thus, the only relevant inquiry is whether Plaintiff's belief that Sullen

was sexually harassing Graham was objectively reasonable.

Defendant asserts that the present case is analogous to Jordan v. Alternative Resources

Corporation, 458 F.3d 332 (4th Cir. 2006).  In Jordan, the plaintiff overheard a coworker comment

on a news report about the capture of two African-American snipers by saying, "They should put

those two black monkeys in a cage with a bunch of black apes and let the apes f–k them." Id. at 336.

The plaintiff was offended by his coworker's comment and reported it to two of his supervisors. Id.

at 337.  Approximately one month later, Plaintiff was fired for being "disruptive." Id.  The plaintiff

alleged retaliatory discharge, but the Fourth Circuit affirmed the District Court's holding that the

plaintiff had not engaged in protected activity by reporting his coworker's comment.  The court held

that the plaintiff's belief that he was subjected to a hostile work environment was not objectively

reasonable.  Id. at 341.  The court described a hostile work environment as a "'workplace . . .

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'" Id. at 339 (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993)).  The court

further noted that "[c]ourts determine whether an environment is sufficiently hostile or abusive by

looking at all the circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." Id. (quoting Faragher v. City of

Boca Raton, 524 U.S. 775, 787-88 (1998)) (internal quotation marks omitted).

Defendants in the present case argue that, like the coworker's comment in Jordan, Sullen's

actions were not so severe or pervasive as to alter the conditions of Graham's employment or create

a hostile work environment.  However, it is important to note that the plaintiff in Jordan argued that

"he had an objectively reasonable belief that Title VII was about to be violated because 'had [the

coworker] continued, unabated, his conduct would at some point have ripened into [a] racially

hostile work environment." Id. at 340 (emphasis added).  The court found that no objectively

reasonable person could have believed that the plaintiff's workplace was soon to be infected by

severe or pervasive harassment based on the coworker's single, abhorrent slur.  Id. at 341.  In

contrast to Jordan, Plaintiff in the present case does not assert that she believed Sullen's actions

would eventually lead to sexual harassment or that Title VII was about to be violated, but that she

believed his actions were sexual harassment.  Although it is implicit in any complaint of harassment

that the complainant believes the harassment will continue unless thwarted, in Jordan, the plaintiff

did not perceive his coworker's one comment to create a hostile work environment, but believed that

-14-

it would become hostile if the coworker continued to make similar comments. The court stated that

it could not assume that a hostile work environment would occur in the future based on the isolated

comment made by the coworker. Jordan, 458 F.3d at 340. In the present case, there is no evidence

that Plaintiff thought only that sexual harassment would occur in the future if Sullen's actions were

not reported. On the contrary, Plaintiff believed that sexual harassment was occurring. As stated

above, Plaintiff must show she opposed an unlawful employment practice which she reasonably

believed had occurred or was occurring. Bigge, 894 F.2d at 1503. Furthermore, Plaintiff did not

base her belief on an isolated event. She testified that Graham told her she was uncomfortable with

Sullen constantly coming in her office, and Graham herself averred that Sullen "has a habit of putting

his hands on my shoulder when talking to me." Graham Aff. at ¶ 7. Thus, the case at hand is

distinguishable from Jordan.

In addition, unlike Jordan, more than one person perceived Sullen's actions as sexually

harassing. Graham herself spoke with her direct supervisor, Melton, and asked her the definition of

sexual harassment. She also told Melton about Sullen's actions and that they made her feel

uncomfortable. Based on the information she received from Graham, Melton reported Sullen's

actions to Dr. Keith as possible sexual harassment. In addition, the SCHAC investigation reveals

that Swinton, who was present when Graham told Plaintiff and several other coworkers about

Sullen's actions, also reported his actions to Dr. Keith as possible sexual harassment. Furthermore,

Plaintiff has presented evidence that Keys reported to Dr. Keith that Sullen made Graham feel

uncomfortable.

The facts that Graham complained of Sullen constantly coming into her office and putting

his hands on her shoulder, that Graham appeared upset, that Graham mentioned her concerns about

-15-

Sullen to several people on different occasions, and that at least three other people viewed Sullen's

actions as possible sexual harassment are sufficient to create a genuine issue of material fact as to

whether Plaintiff's belief that Sullen's actions constituted sexual harassment was objectively

reasonable.  It must be recognized that to qualify as a hostile work environment under Title VII, the

environment must be permeated with discriminatory action and be sufficiently severe and pervasive.

There is no doubt that the facts involved here do not in and of themselves qualify as a hostile work

environment.  This is a very close case and Plaintiff survives summary judgment on this protected

activity issue by a thin thread.  Nevertheless, as noted in Jordan, the objective reasonableness

standard serves to protect an employee's judgment in a close case.  Jordan, 458 F.3d at 342.  Thus,

the question of whether Plaintiff participated in protected activity when she reported Sullen's actions

to Dr. Keith survives the summary judgment stage.

    Because Defendants concede for purposes of their motion that Plaintiff meets the second and

third elements of her prima facie case of retaliation, the burden shifts to Defendants to produce a

legitimate, non-retaliatory reason for the adverse employment action suffered by Plaintiff.  Texas

Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of

production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  Once

Defendants have met their burden of production, the burden shifts back to Plaintiff to demonstrate

by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true

reason, but pretext for retaliation.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143

(2000).  Throughout the burden shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973)[5], the ultimate burden of proving that Defendants intentionally retaliated against

Plaintiff remains at all times with Plaintiff.

As evidence of its legitimate, non-retaliatory reason for transferring Plaintiff to a position at

the Lake City office, Defendant offers the Record of Employee Counseling form, which was issued

to Plaintiff by Dr. Main on October 8, 2003.  Plaintiff Dep. at Ex. 5.  In the form, Dr. Main explains

the reason for the action taken against Plaintiff:

> [Plaintiff] persisted in her allegations that another staff member was being sexually
> harassed by their supervisor, even after being told by that staff member it was not so.
> She continued to inform other staff members of these allegations. This was a
> malicious act. After informing Dr. Keith of her concerns, the proper response was to
> no longer say anything to anyone. This behavior was unnecessary, unprofessional and
> continued to stir distress in the working atmosphere to the point that [Plaintiff's]
> continued participation in that atmosphere is no longer tenable. She will be
> transferred to another work unit. Any future behaviors of this sort while working at
> Pee Dee MHC will result in progressive disciplinary action.

Id.  As noted above, Dr. Main based his decision on the recommendation of Jacobs, the Employee

Relations Manager who conducted an investigation into Plaintiff's actions, and input from Sullen

himself, as Plaintiff's direct supervisor.  In her report to Dr. Main, Jacobs concluded, "that [Plaintiff]

continued to act improperly after making her complaint by discussing that alleged 'sexual

harassment' with Ms. Graham and perhaps others, which led to the entire workplace being filled with

unsupported rumors and speculation, potentially damaging to Mr. Sullen's reputation."

Plaintiff argues that a genuine issue of material fact exists as to whether Defendants'

articulated reason for her transfer to Lake City was actually pretext for a retaliatory reason.  Plaintiff

maintains that she did not spread any rumors about Sullen and that Defendants failed to produce

---

[5]The McDonnell Douglas burden shifting scheme applies in analyzing retaliation claims
under Title VII.  Smith v. First Union Nat'l Bank, 202 F.3d 234 (4th Cir.2000).

testimony from any witnesses that she did spread rumors.  Jacobs Aff. at ¶ 16.  However, Defendants do not bear the burden of persuasion with regard to the legitimate, non-retaliatory reason for Plaintiff's transfer to Lake City.  Thus, it is not necessary for Defendants to produce any evidence to support their reason for the transfer.  They met their burden of production by articulating a legitimate reason for the transfer.  As noted by Defendants, "while an employee may not suffer retaliation for protected activity . . . the employee's own conduct must not be disruptive of the employer's business" as the anti-retaliation law "'was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'" Zhang v. Science & Technology Corp., 382 F.Supp.2d 761, 775 (D.Md. 2005) (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir.1981)).

Plaintiff next argues that the findings of the SCHAC and the EEOC create an issue of fact as to whether Defendant's reason for Plaintiff's transfer was pretext for a retaliatory reason.  Both the SCHAC and the EEOC issued determinations that Plaintiff's claim of retaliation was supported by the evidence and that no evidence existed to support Defendants' contention that Plaintiff discussed the sexual harassment complaint with anyone except Dr. Keith and Graham.  Defendants cite Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988), for their argument that EEOC findings are to be accorded no weight at summary judgment.  However, the holding in Goldberg is not as broad as Defendants assert.  The court's conclusion that the Commission's findings "are not sufficiently probative to create a genuine issue of material fact" was based on the fact that the "[t]he Commission's report merely repeats facts which [the plaintiff] himself alleges elsewhere in this case, and then states in conclusory fashion that those facts reflect age discrimination." Id. at 848.

In the present case, the record from the EEOC reveals facts not otherwise in evidence.  It also reveals facts that are inconsistent with the findings made by Jacobs and Dr. Main regarding Plaintiff's behavior in connection with the sexual harassment rumors.  Thus, the holding in Goldberg is not determinative here.  However, as noted in Goldberg, the admission of EEOC findings is within the discretion of the court.  Id. at 848 n.4.  Furthermore, the Fourth Circuit has indicated, "[w]e agree with [the plaintiff] that, absent a showing of untrustworthiness, factual findings resulting from an agency's lawful investigation are generally admissible in civil actions."  Baker v. North Carolina Dept. of Commerce, Div. of Communiity Assistance, No. 97-1986, 1998 WL 168462, * 2 (4th Cir, Mar. 26, 1998) (citing Fed.R.Evid. 803(8)(C)).

The EEOC record includes investigation notes from an investigator with the SCHAC.  The investigator interviewed numerous employees that knew of the sexual harassment allegations made against Sullen.  Ex. 15 to Plaintiff's Response.  Each of the employees indicated that they did not originally hear of the allegations from Plaintiff nor did they ever hear Plaintiff mention the allegations.  Id.  Dr. Keith indicated that Plaintiff never mentioned the allegation to him after her initial report.  Id.  These findings made by the SCHAC investigator are sufficient for purposes of Rule 56 to create a genuine issue of material fact as to whether Defendants' legitimate, non-retaliatory reason for transferring Plaintiff is the true reason or is merely pretext for a retaliatory reason.  Thus, Defendants' Motion for Summary Judgment should be denied.

## V.     CONCLUSION

For the reasons set forth above, it is recommended that Defendant's Motion for Summary

Judgment (Document # 19) be denied.


                                          s/Thomas E. Rogers, III
                                         Thomas E. Rogers, III
                                         United States Magistrate Judge

August 17, 2007
Florence, South Carolina


**The parties' attention is directed to the important notice on the next page.**